We'll go to the first one. It's Cardenas v. Saladen, 22-15632. And whenever you're ready, counsel, we're ready to hear your argument. David Abney, Your Honor. May it please the Court, I'm here today representing Kyle Cardenas on... Cardenas. I think I mispronounced it. My apologies. That's okay. On September 12, 2015, Kyle was at his home. He was having some difficulties with his post-traumatic stress disorder. He was a combat veteran who had served two tours in Iraq as a member of the 82nd Airborne Division, and he was back at home living with his family. His mother called a crisis hotline with the veterans people that actually went to New York, and somehow the message got garbled about what was going on. Kyle was under the impression that his mother was trying to serve him with poisoned food, and so he was passing it on to the dog, which was not a nice thing to do to the dog, possibly. But the food wasn't poisoned, and the dog was fine. Somehow it became... Except the officers didn't know that, right? I'm not trying to interrupt, but I think the officers got garbled information and understood there had been an attempt by your client to poison the dog. Is that right? Right, and that's what they suspected was going on when they arrived at the home. So, Kyle comes to the door when they bang on the door, and they say, you know, please, may we come? He says, no, and shuts the door. And then he retreats back into the house. They continue to bang on the door. The mom comes to the door and says, where are the police? Can we come in? And there we have a dispute of fact, whether she or her husband agreed or did not agree that the police could come in. The police get into the house. Kyle doesn't have anything to do with them. He says... Am I right that police officers could see that his mom was visibly upset? Well, yeah. She had the police barging into her home when her son had told the police to go away. And her position is that she did not give permission for them to enter. That's correct. Okay. But there is a dispute of fact about that, something for the trier of fact to resolve. Although it's not a dispute of fact that the order that was entered by the district court, because he didn't base his order on consent. Right. It was a dispute of fact only if that issue gets reached. We don't need to reach that issue if we go along with the conclusion of the district court. No, you don't need to reach it for the initial consent to get into the house. There's certainly a dispute about that. I think you do need to reach consent when you start getting to the point where Kyle's in the house, the police say that Kyle said, sick him to this mastiff. And they were worried about that. And the dog just trod on by. He's fine. He's happy. He felt there's no problem. 110 pound dog. Big dog. It's a really big dog. Big dog, but a big dog. So go back to this. There's this question, I think, a dispute about whether your client said, get him to his mom as in take the dog versus sick him. Right. But when we talk about these kinds of cases, the question is what would a reasonable officer have done? And there's this mistake of fact right there. Is it your contention that the officers were unreasonable in that understanding? Absolutely. They could look at the dog. The dog was happy, healthy, just trod on by, not bothering him the slightest, not looking ill. They didn't, of course, they didn't do any sort of investigation. They asked the mom, is he poisoning the dog? Okay. So you answered that question. I assume there was just the one dog. They may have been able to see if this dog was healthy. They did not know that there was not an attempt by your client to poison the dog. They had no indication once they got on the scene of that being true. That's not the question I asked. Your client may have attempted to poison the dog and failed as far as the officers were concerned. They were told based on the report from the mother, and it may have gotten garbled when it got to them, but what they understood, and I think your brief acknowledges this, that they were told that he thought his parents, his mother were trying to poison him and he in turn fed the poison to the dog. That was nothing that they knew different from that at the time they were in the house. Yes, they did. By personal observation, they knew there was nothing visibly wrong with that dog. But that doesn't answer the question. It does. No, because what happens if your client, thinking that his parents are trying to poison, tried to poison the dog but failed? That doesn't mean that the client that they were concerned about, your client they were concerned about, hadn't in fact tried to poison the dog. There's no proof of that at all. No, stop. The key here is what was the understanding of the better, but based on what they had been told, they were sent to this property with the understanding that your client thought his parents are trying to poison him and he fed it to the dog. He may have been wrong. Certainly, we know he was wrong with regard to what his parents were doing with him, but that doesn't mean that the officers had a basis for concluding, oh, there's no risk here. Everything's just fine. Because based on what they've been told, your client, plainly not in his right mind, thought he had been poisoned and could respond accordingly. No, Your Honor. The basis here, the fundamental question here is what could reasonable jurors conclude? No, it's not. Yes, it's a summary judgment. What could reasonable jurors conclude about what the officers thought? Exactly right. Well, you keep skipping the second part. No, I'm not. This is the typical- Let me, could I do it this way? Could I do it this way? I want to give you a chance. I've got a list of bullet points of what I think the officers, the information they had going in. This is what I, and if you could correct me if I'm wrong. I think from the phone calls going in and the information from dispatch, they thought they knew, right? That your client had claimed he'd been abused since he was a child and was demanding to speak with CPS, Child Protective Services, right? Yes, Your Honor. Okay. They thought they knew that he had tried to poison his dog and he thought that his parents were trying to kill him. They thought they knew that. Is that fair? They thought that. Yeah. That was the Garber report they got. Right. Mistaken. Right. But the point is at that time, that's the information they had. The next bullet point I have on my notes here is that they knew that, or thought they knew that your client had been diagnosed with PTSD. Sorry, that he was a vet with PTSD. Right. Okay. He was described as extremely irate. Sure. Yeah. He wouldn't give this phone back to his mom and wouldn't allow her to speak. They thought they understood that. They've been told that. Yes. But then again, I would say, so what? Well, the so what is that we see cases that's pretty consistent in domestic violence patterns, which it struck me as significant. They came in, they thought, they understood, they were observing their mom, the mom, mother was in tears. Well, sure. The police had just barged into her house. Okay. And then there's, they said his demeanor was generally belligerent and there was this confusion about whether he said to the dog that he asked to get him or asking his mom to get the right before the bedroom door was kicked in. Is that fair? Yes. And you bet he was belligerent. The police had just barged into his home after he had shut the door on them and said, don't come in. So naturally he was belligerent. Naturally he was upset. What about the information from dispatch, which was vet, PTSD? We always, of course, worry about that. Those calls are very concerning to the police officers. He's irate. And then it struck me that the officers have this really concerning information in this report about him saying that he'd been abused as a child and demanding to speak to Child Protective Services. Right. He obviously had problems. He had PTSD. He had problems. No question about that. I mean, it's really a dangerous situation, sir. No. Because once they got there, they should have, reasonable jurors could conclude, taking every reasonable inference in favor of my client, which is what this court is obligated to do and what the district court was obligated to do. Every single reasonable inference has to be taken in favor of my client. None. No reasonable inference at all can be taken against him. Inference about what? Inference about the condition of the dog, what was going on. No. Not the question. The question is what could the reasonable officer have concluded? No. If you're going to take the position no to that, then I think we're done. Because that's the question that we're facing today. Not what somebody else could have concluded as to whether he was really in distress, but whether the reasonable officer could have danger. If we're done, we're done. But I'm going to go down fighting for the rule of law. The rule of law in this case is that every single reasonable inference has to be taken in favor of Kyle. Every single one. The facts have to be looked at. What is the question? What is the question? I know what the question is. The answer is- We don't see it, too, because the question as to qualified immunity is what could the reasonable officer have believed? Now, the officer could have been wrong. And the Supreme Court has been very clear that even if the officer is wrong as to what danger was being faced, if the reasonable basis existed at that time for the officer's conclusion, the officer could act on that reasonable basis. Your Honor, that is not the question. The question, because this is a summary judgment proceeding, this is not whether there should be qualified immunity or not. The question is what can reasonable jurors infer from the facts? Taking every single reasonable inference in favor of Kyle and doing every item of evidence in favor of him, what could reasonable jurors conclude? About what the officers understood? Yes, about what the officers understood. That's the point. I'm with you. And so that's why these bullet points are, to me, really critical. They're critical, but they have to be viewed from the viewpoint of reasonable jurors. Reasonable jurors who are looking at the facts in the light most favorable of Kyle. Look at those facts in most favorable to him. But Kyle's, the dog's healthy. Hang on. So if we do that, I think that some of these facts can be viewed in the light most favorable to your client and some of the air gets taken out of the balloon because you're attributing some of his irate behavior to the fact that he thinks the police have barged into his home. And they have. Hold on. Yes, Your Honor. What about everything that happened, please, sir, so we can get some communication. What about everything that happened from the dispatch? That didn't change. That happened before the police ever got to the front door. And the information they had there was very concerning, wasn't it? Sure. But you have to take into account what happens after they arrived at the scene. What did they find when they were actually there? What could reasonable jurors conclude? I am not here to win this case on appeal. I am here. Apparently not. I'm not. I won't acknowledge what the question is. Your Honor, as Justice Jackson said in his famous article on Appellate Advocates Supreme Court, it's only a fool who tries to win a case on appeal. I'm trying to get the court to look at the briefs and the facts and to say, well, what could reasonable jurors decide? That's what matters. Decide about what? That's all it's about on the summary judgment. Decide about what question? About what these police officers knew or should have known. And we're on the same page. But tell us why reasonable police officers, with the information that Judge Christian just outlined in bullet points, couldn't reasonably conclude this was a dangerous situation in which they were justified in acting. They could have taken, reasonable inferences could be taken in their favor that they should have concluded that. Reasonable inferences could be taken against them just the opposite way. How? How? Knowing what Judge Christian just read to you, how could an officer be expected to realize there's no danger here? The dog is happy, healthy, not bothering them at all. Their own police department said they violated his constitutional rights. Their own police department said that they used excessive force. Their own police department said there was no probable cause. And the judge reported that his parents were trying to poison him. And you wanted the police officers to leave him in the house with those parents and not to investigate further. When your client went into the other room and closed the door and they asked him not to, no, he closed the door. He wouldn't talk to them. If the concern was that the parents were poisoning him, they should have arrested the parents. They didn't. They had no clue what was going on until they got there and then they had a clue. Okay. Judge, if you're frustrated with me, I am. Trust me. I hope you are. Because I want you to focus on how it is the officers could, a reasonable officer, we don't even have to take these officers, a reasonable officer would not have perceived danger here. With the facts you just heard. Even the district court should accept it as evidence. What their own police department did, their own police department condemned both of them and said that they both violated constitutional rights. That is evidence according to the district court judge. It's also 20-20 hindsight. No. As a matter of, well, sure it is. It's a retrospective investigation and police departments do that and should be applauded for doing that to see whether they're meeting their own standards and behaving appropriately and that's important for training purposes. That's not what we're doing here. We're asking ourselves, we're time traveling back and asking what a reasonable officer in that position would believe. And the law is very clear. They're reasonable. Yes, but it's up to the jurors to decide that because there are disputed issues of fact right down the line. Let's get to him going to his room. He retreats into his room. He locks the door. He doesn't want to be bothered. He's a combat veteran with PTSD and instead of backing off, getting a warrant, which they had plenty of time to do, they break into his room and he's not doing anything wrong. The facts are unequivocal on this. He's doing nothing. He's got a camera. He wants to photograph him. Stop. They break into his room and you think they shouldn't have and could have done it better and they could have and maybe that's all correct. Yes. But we know after the fact when they break into his room that he's not doing anything wrong and he didn't have a weapon and he wasn't ready to shoot something. They knew before the fact. No, they knew his mom said she didn't think he had a weapon. Those are different things. So why are they barging into his room? What has he done that is a felony that they have to go and pursue him? Nothing. He has done nothing except leave me alone. He closes the door. He locks the door. He retreats to his bedroom. That's the essence of the Fourth Amendment. That's the reason we had a revolution to stop British police officers, British tax collectors, British customs officials from barging into the homes of American citizens, breaking into their bedrooms and seizing them. That's exactly why the Fourth Amendment exists. They threw it out the window. Their own police department recognized that they had done that after the fact. You're out of time. Yes, Your Honor. Well, actually, yes, I apologize. You don't owe me an apology and I appreciate your zealous advocacy for your client, but we do know what the Fourth Amendment's about. Please, for planning purposes, when you come back, we'll put another minute on the clock so you have an opportunity to respond to opposing counsel. I have two minutes. Yes, Your Honor. Thank you. Good morning, Your Honors. My name is Robert Grasso and I represent Officer Josiah Saladin and Officer Larry Six. Should we be concerned that by kicking in the bedroom door that the officers escalated the situation and the tensions and made this more dangerous? I think it's an appropriate question for Your Honor to ask, but I think the answer to the question was the conclusion reached by Judge McNamee, that they were still responding to an today. Is there a disputed fact about whether there was permission given to come into the front door? I think that's correct, and I think that's why the district court decided to go with the emergency clock, and I agree with the district court. Okay, good. I do too. So now we're going to get into the hallway, please, and we're going to check the bedroom door. Before the bedroom door got kicked open, I listed a set of bullet points that I have here in my notes about what the officers thought they knew. And I think in retrospect, we all understand some of the correct. But the point is, right, what they thought they knew before the door was kicked in, and I listed a set of bullet points. Do you agree with those bullet points? Did I miss anything? Oh, yeah, I'm sorry, Your Honor. Yes, I agree with the bullet points. I think I had a couple more. I was trying to check off my list because I have the same list in front of me. Go right ahead. And can I just add one thing, Your Honor, that I think is important? Because I think the Supreme Court and the Ninth Circuit recognizes all of this has to be viewed from the perspective of at the scene without the benefit of 20-20 hindsight. Well, not those officers. It's not their subjective understanding. It's what a reasonable officer would think. Absolutely, Your Honor. Viewing it through the proper spectrum. And I think it's important. I think Your Honor was asking Mr. Abney about this, about the calls that the officers didn't hear, the dispatch calls that preceded them being there. I think those are significant. They're the record ER 201 and 203, and I'm sure Your Honors are familiar with it. But I think those because as Judge McNamee, the district court found, it corroborated what was ultimately told to the officers that's in ER 203, which is the bullet points that Your Honor relied on. But there's corroboration going the other way too. This isn't a 20-20 hindsight kind of a deal. So if you think the officers didn't know all of this information I had in my bullet points, then I would like to be corrected. No, Your Honor. I believe they did. I think your bullet points were correct. I mean, we have 12 minutes. So look, I'm just going to run through these, all right? Yes, Your Honor. Did the officers think, did they understand, had they been told, that the plaintiff had said he had been abused as a child and was demanding to speak with Child Protective Services? That is correct, Your Honor. The officers knew that? The officers knew that. That was part of the dispatch under ER 203. All right. And the dispatch told him that he had poisoned his dog and thought his parents were trying to kill him? That is correct, Your Honor. And that he was a vet with PTSD? Yes. And also, can I add something? Yeah. That the mom and the son are in the same residence, that's significant. That they're living together, that's significant. Right. Which goes to Judge Clifton's point. They can't just leave. She lives there. Sure, Your Honor. And just preceding that, there was a notation that he was not being himself and the PTSD. Right. Okay. Not being himself. And did the dispatch say he was extremely irate? Absolutely, Your Honor. Did they know, from listening to the 911, I know there's some very colorful language, but the officers didn't hear him directly. They just heard dispatches. Correct. Summary, yes. That's true. But they understood that he took the phone away from the mother and was not allowing the mother to speak. Okay. That was my next bullet point. Then they got to the house and they understood the mother had been crying or maybe was crying. That's correct, Your Honor. That was their observation. They also asked her, before kicking in the door, whether he had any weapons. And she said, I think none whatsoever. I don't recall the audio being that clear. I thought she said something like, I don't think so. She didn't give them any indication to think that he had a gun in her. That is correct, Your Honor. Okay. And then there's the information or miscommunication about the dog. Correct, Your Honor. And the officers themselves made the observation that his demeanor was belligerent. Correct, Your Honor. And the district court found that as well. Am I missing anything? I do not think so, Your Honor, other than... And why were they free to kick in the door? Because, Your Honor, I think at that point in the scenario, after Kyle had been in the hallway, after the dog came by, and I think there was actually a question which cooperates in some sense the officer's position. He says, you just told your dog to get us. And he goes, that's what you would do when you watch it on the video. Yep. And so it's clear that the officers concluded at that point, I believe they had enough information at that point to formulate the thought that they need to get this man under control. They need to get him stabilized. Officers saying... Wait a minute. Those are different things. What's the emergency exactly? Is that the warrantless exception we're going to rely on here that you're going to rely on? That there's an emergency? Yes, Your Honor. Okay. What's the emergency? I believe the emergency, Your Honor, is the constellation of all of these factors that this was a domestic disturbance situation with a man who they believed was both mentally unstable. He's making statements about believing his parents are going to kill him. He is poisoned. They believe that time, albeit maybe incorrectly later, that he had poisoned the family dog. So this was a combustible situation that was rapidly evolving. And we've got a man there who's very large. He's 6'3", 250 pounds. He's not responding to them. He's not obeying commands. He was talking to them. He was certainly responding to them. He wasn't obeying commands, but he was certainly communicating with them. He was, Your Honor. But I think that that's the point when a police officer, when something's rapidly evolving this way, and you've got a guy who is without question, and the district court found this, being belligerent, fighting with the officers. They told him to put his hands over his head and to turn around, and then he flees from that. Officer Sinks expressly told him not to go. When you say flees from them, he turned around and went into his room and shut the door. Is that what you mean? Or did he do something else? No, that's what he did, Your Honor. But I think he had been commanded not to do that. And I think that was... Was he told to stay there or was he told to turn around? Yes, he was, Your Honor. Officer Sinks told him not to go. If you look at the video, it's 241. Thank you. Okay. I'm sorry, Your Honor. Excerpts of record 241. Officer Sinks clearly tells him not to go, and he continues to go. I think at that point... But he's fleeing from them. He's not attacking them. Not yet. Well, just now that you've had to hear for 15 minutes us discussing the standard of review and the burden of proof and viewing all the facts in light most favorable, he didn't attack them. He fled. That was your word. So what's the emergency? I think it was an ongoing emergency because they were trying to stabilize the situation. They wanted to make everybody in the room and the house safe. Is the concern... Forgive me for interrupting, but I still not... When you say ongoing emergency, is the reasonable concern that he was a danger to himself or a danger to others? I think it was both, Your Honor. Okay. I think in these particular circumstances, the officers were dealing with a rather tense, uncertain, rapidly evolving set of circumstances. When you look at the video, we're talking just a matter of minutes. They were immediately trying to stabilize the situation to make sure that if they could have a meaningful conversation with him, which is not what they were having. He was being belligerent, arguing with them, that's what you would do, and that sort of thing. He was told to put his hands above his head. He didn't do it. He was told to turn around because they wanted to take him into custody. I mean, again, if I could. Yeah, sure. Because I want you to respond, please. Opposing counsel's view is he did all of that, and you would too. He didn't say that part. If the police barged into my house without a warrant, uninvited, and in fact, I told him to leave. That's his argument. Do you want to respond to that, please? Sure, Your Honor. I believe the officers believed they were dealing with somebody who was mentally unstable, at least based on the reasonable information that an officer had responding to a call with a military veteran with PTSD who was asking for child protective services, even though he's an adult that's 36 years old. I think the officers could reasonably conclude that this person may have some mental instability that could pose a harm to the mother and father. But can I ask you, forgive me again for interrupting, but where was the father? At what point in the scenario? I apologize, Your Honor. I think the record's a little bit unclear on this. It's clear about the front door and then the door being reopened. And when we're in the hallway, was the father in the hallway with the dog and the mother? I believe he was on the- Just outside the bedroom door? I think he was on the other side of the hallway at that point, because I think he had, after the officers came into the house, he was in a back room. And the only reason I know that, Your Honor, is when I watch ER 241, I know at one point, Officer Sinks has to get the father out of harm's way when Kyle, the second time, barricades himself in the room. I know that Mr. Cardenas, the father, is in a back room. So he somehow got there. So I'm just making that assumption, though, Your Honor. But I believe the district court, Your Honor, properly highlighted the very facts that Your Honor highlighted. And the real question in this case, as I think Your Honors had pointed out, the court decided this based on qualified immunity. And qualified immunity allows the officers to use their judgment, and it does afford them protection, even if it can be argued that some of these decisions were a mistake. I really- They clearly were. Some of this information is wrong, right? Well, Your Honor- The question is whether they were unreasonable. They were given some incorrect information from dispatch, right? Absolutely, Your Honor. Well, I think the information of the dispatch was not necessarily incorrect. I believe the mother does say, when you look at the audio recordings, that he- Well, the dispatch said he poisoned his dog. He didn't poison his dog. Well, I don't know that one way or the other. I don't know if anybody really knows that. I don't know what was fed to the dog, Your Honor. I know that Mr. Cardenas believed his parents were trying to kill him, so he fed whatever food she was giving him. I can tell you during the depositions that he gave a salad to the dogs. I don't believe he poisoned the dog. I don't think any believes that his parents are trying to poison him, or that he really poisoned the dog. The depositions do tell me he thought the salad was poisoned, and he gave the salad to the dog. Absolutely. Be that as it may, I think the part of this conversation that is most salient to me, and certainly Judge Clifton has made it clear it's most salient to him, is that the police officers thought they understood. This is the information they had going in. Yes, Your Honor, and I think that is what's important. And I think when that is viewed under the appropriate standard of an officer having to make split-second decisions in circumstances that are tense, uncertain, and potentially volatile, then I think the decisions they made here were reasonable. Their decisions to enter were reasonable. I believe Judge McNamee correctly concluded that it was reasonable, he factually concluded, for them to enter the bedroom in these circumstances, and then they were simply trying to get him under control. And force was not used against him until he started fighting with the officers. They attempted to go... Back to kicking in the front door, the bedroom door, if you would, because for me that's the very critical point, about whether they can kick in that door. And opposing counsel, I haven't given you a chance to respond to this yet, but opposing counsel's position is that that was not a lawful entry into the bedroom door because he had retreated and his position was, go away, leave me alone. So he wasn't threatening anyone at that point. Would you like to respond to that? Yes, Your Honor, I believe a reasonable police officer could conclude that he was a danger, knowing that he was a military... Sorry, to himself or to others? Both. Okay, go ahead. Yeah, because he's a military veteran with PTSD and there's been statements made to the officers about him believing his parents were going to kill him, and he's been acting belligerent, and he's not following lawful orders from the police. I think it was reasonable for them to assume that he may be getting a gun, that he may be doing something. If you listen in ER 241, officers saying to my client, the president said, I can't see what you're doing. Don't go where I can't see what you're doing. And so I think Judge McNamee, the district court judge, correctly concluded that this was still part of the ongoing emergency. They were not going to let Mr. Cardenas retreat to a room so he can come out with a shotgun or something else that could harm the police officers, himself or other occupants in the house. So I do believe it was appropriate for them to go into the bedroom, even though the door was locked. Is there anything in the record that tells me in this particular jurisdiction about the availability of a warrant, how fast they could have obtained one? I don't... There's nothing in the record to answer that question, Your Honor. I couldn't find anything either. There isn't. I want to make sure I didn't miss it. Do you have more you would like to add? The only thing I want to briefly address, Your Honor, and we've talked about it, is the position on the recently added taser argument that's been offered by the plaintiffs in this case, that those were cases that were not cited to the district court. And we respectfully submit, because those weren't raised to the district court, it's improper to bring them up on appeal. With that said, I do want to comment that I believe when you look at the known factors in Graham versus Connor about when it's appropriate to use force, and you look at the factors of the severity of the crime at issue, whether the person is posing a danger to the people around him, including the police officers, and whether he's actively resisting arrest. The issue of the taser, which was never really discussed or briefed in the district court, that only comes into play in this particular case after the officers attempted to go hands-on with him to detain him and cuff him in the room. And then he violently attacked the officers. And you can see that he smashes my client's head against the wall. He was only tased for the first time. They attempted to tase him, I should say, because you're going to see in the video, it didn't because the barbs didn't connect. But I respectfully submit, Your Honor, that the idea that somebody just simply went in from the argument and tased him is not fair and it's certainly not accurate. They only attempted to use that less lethal amount of force after he had assaulted a police officer. And the record does establish that he did, and he was charged with aggravated assault. I see I'm out of time, Your Honor. Thank you. Thank you for your argument and for your briefing, counsel. We'll hear from the opposing counsel, please. Thank you, Your Honor. I have four points I hope I can get out of my time. Take your time. First, even the district court acknowledged that although Kyle had supposedly continued to act belligerently, he actually only, quote, hid inside of his room, end quote. That's from the district court. Second, even the district court admitted that the record here does not definitively establish an emergency situation. That's a direct quote from the district court. The district court said that the legality of the arrest was arguable. That's a quote from the district court. Fourth, this is a summary judgment proceeding. I cannot, it's not my job to convince you as trier of fact about the facts of the case. It's my job to get you to look at the briefs and to consider, should this have gone to a jury? And it should have. It was not correct for the district court to cut this off. There are disputed issues of fact. There was no emergency situation. There was a man who didn't want the police in his house to begin with and definitively did not want the police inside of his locked bedroom. They burst into the door. They violated the Fourth Amendment. Their own department blamed them as evidence. The district court said that's evidence for the trier of fact, evidence. It should go to the jury. Thank you, Your Honor. And thank you, Ronald, for coming from Honolulu to be here today. Thank you both. We'll take this case under advisement.
judges: GRABER, CLIFTON, CHRISTEN